## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FREE SPEECH FOR PEOPLE
1320 Centre Street #405
Newton, MA 02459,

CAMPAIGN FOR ACCOUNTABILITY
611 Pennsylvania Ave SE #337
Washington, D.C. 20003,

        Plaintiffs,

    v.

FEDERAL ELECTION COMMISSION
1050 First Street NE
Washington, DC 20463,

        Defendant.

Civil Action No. 22-cv-666

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Plaintiffs Free Speech For People and Campaign for Accountability are nonpartisan, nonprofit watchdog groups. They bring this action against the Federal Election Commission ("FEC") for declaratory and injunctive relief under the Federal Election Campaign Act ("FECA"), 52 U.S.C. § 30109(a)(8)(A).

2.      On December 16, 2016, Plaintiffs filed before the FEC an administrative complaint against the Government of the Russian Federation ("Russian Federation") and Donald J. Trump for President, Inc. ("Trump Campaign"), alleging violations of FECA during the 2016 election.

3.    The main focus of FECA is the money: who paid, how much, to whom, and when. Under FECA, foreign entities are prohibited from spending *any* money to influence U.S. elections. And just as Al Capone was obligated to pay taxes on illegal income, even illegal political spending—recipients, dates, amounts, and purposes—must be publicly disclosed.

4.    Plaintiffs' administrative complaint, as amended, alleged that, for the purpose of influencing the 2016 presidential election, the Russian Federation had: paid hackers to hack into Democratic National Committee servers and leak the hacked information; paid people to make social media posts; and paid for political advertisements. The administrative complaint also alleged that the Russian Federation did not disclose any of this spending. Finally, the administrative complaint alleged that at least some of the Russian Federation's political spending was "coordinated" with the Trump Campaign.

5.    In federal election law, the term "coordinated" has a specific meaning that is distinct from other terms, such as conspiracy. "Coordination" under FECA and its regulations does *not* require agreement or formal collaboration; coordination occurs when spending is made "in cooperation, consultation or concert with, or at the request or suggestion of" a candidate, his committee, or his agent, and even in some circumstances short of that. 52 U.S.C. § 30116(a)(7)(B)(i); 11 C.F.R. §§ 109.20-21. And when political spending by an outside entity is "coordinated" with a campaign, the campaign is *also* obligated to disclose the dates, amounts, and purposes of that spending. 11 C.F.R. §§ 109.20, 109.21(b)(1)-(2).

6.      Since the filing of the administrative complaint, some new information has emerged. But other investigations, pursuing different angles for different purposes and with different mandates, have not focused on bringing transparency to campaign financing—the FEC's mandate. Even today, despite multiple investigations, critical information about the money spent in the 2016 election is still unknown. How much did the Russian Federation spend? When and for which efforts did it make the payments? How much (and which) of that spending was "coordinated" with the Trump Campaign?

7.      Upon receiving Plaintiffs' administrative complaint, the FEC was charged with answering these questions in determining whether there was "reason to believe" that a violation of FECA had occurred.

8.      The nonpartisan professional career staff at the FEC's Office of General Counsel ("OGC") recommended finding reason to believe that the Russian Federation:

     a.  violated 52 U.S.C. § 30121(a)(1)(C) and 11 C.F.R. § 110.20(f) by making prohibited foreign national expenditures and independent expenditures in connection with the influence campaign targeting the 2016 presidential election;

     b.  violated 52 U.S.C. § 30104(c) and 11 C.F.R. § 109.10(b) by failing to report independent expenditures in connection with the influence campaign; and

     c.   violated 52 U.S.C. § 30121(a)(1)(A) and 11 C.F.R. § 110.20(b) by making a prohibited in-kind contribution to Donald J. Trump for President, Inc. by expending resources to hack Clinton-related servers in response to a request or suggestion that Trump made at a press conference.

9.    OGC recommended finding reason to believe that the Trump Campaign:

     a.   violated 52 U.S.C. § 30121(a)(2) and 11 C.F.R. § 110.20(g) by knowingly soliciting, accepting or receiving an in-kind contribution from the Russian Federation in connection with Trump's press conference statement; and

     b.   violated 52 U.S.C. § 30121(a)(2) and 11 C.F.R. § 110.20(g) by knowingly soliciting a prohibited in-kind contribution from WikiLeaks.

10.    When the FEC voted on OGC's recommendations, it failed by a 3-3 deadlock to find reason to believe that either the Russian Federation or the Trump Campaign violated FECA.

11.    On January 13, 2022, the FEC closed its file on Plaintiffs' administrative complaint.

12.    Under 52 U.S.C. § 30109(a)(8)(A), if the FEC dismisses an administrative complaint, the complainant may file an action in this Court challenging the FEC's dismissal as contrary to law.

4

13.     Plaintiffs ask the Court to declare that the FEC's dismissal of the administrative complaint is contrary to law, and order the FEC to conform with this declaration within 30 days under 52 U.S.C. § 30109(a)(8)(C).

## JURISDICTION AND VENUE

14.     This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties under 52 U.S.C. § 30109(a)(8)(A) and/or 5 U.S.C. § 702. This Court also has jurisdiction over this action under 28 U.S.C. §§ 1331, 2201(a), and/or 2202.

15.     Venue lies in this district under 52 U.S.C. § 30109(a)(8)(A), 28 U.S.C. § 1391(e), and/or 5 U.S.C. § 703.

## PARTIES

16.     Plaintiff Free Speech For People is a national non-partisan, non-profit 501(c)(3) organization that works to restore republican democracy to the people, including through legal advocacy concerning the law of campaign finance. Its supporters around the country engage in education and non-partisan advocacy to encourage and support effective government of, by, and for the people, including through efforts to identify and combat foreign influence in our elections.

17.     Plaintiff Campaign for Accountability is a national non-partisan, non-profit 501(c)(3) organization that uses research, litigation, and communications to expose misconduct and malfeasance in public life. It works to bring transparency to government and corporate actors and reform the campaign finance system to eliminate the corruption that flows from unlimited spending.

18.     Defendant Federal Election Commission is an independent federal agency charged with the administration and civil enforcement of FECA. 52 U.S.C. § 30106.

## STATUTORY AND REGULATORY BACKGROUND
### Campaign Spending and Disclosure Requirements

19.     Under FECA and FEC regulations, it is unlawful for "a foreign national, directly or indirectly, to make a contribution or donation of money or other thing of value. . . in connection with a Federal . . . election," or make an "expenditure" to influence a federal election. 52 U.S.C. §§ 302121(a)(1)(A), (C); 11 C.F.R. §§ 110.20(b), (f). An "expenditure" includes "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(9)(A).

20.     Any person that is not a political committee that makes independent expenditures exceeding $250 for a particular election in a calendar year "shall file a verified statement or report on FEC Form 5 in accordance with 11 CFR 104.4(e) containing the information required by [11 C.F.R. § 109.10(e)]." 11 C.F.R. § 109.10(b). If the aggregated expenditures exceed $10,000 per election for a particular election up to and including the 20th day before an election, the person making the independent expenditures "must report the independent expenditures on FEC Form 5, or by signed statement if the person is not otherwise required to file electronically under 11 CFR 104.18." 11 C.F.R. § 109.10(c).

21.     Under FECA and FEC regulations, expenditures that are "coordinated" between an outside party and a campaign or candidate are generally deemed to be both in-kind contributions to, and expenditures by, the campaign. 52 U.S.C. § 30116(a)(7)(B)(i); 11 C.F.R. §§ 109.20(b), 109.21(b)(1).

22.     A third-party expenditure is deemed to be "coordinated"—and therefore an in-kind contribution—if it is "made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." 52 U.S.C. § 30116(a)(7)(B)(i); 11 C.F.R. § 109.20(a) ("*Coordinated* means made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or a political party committee.").

23.     In Section 214 of the Bipartisan Campaign Reform Act of 2002, Congress instructed the FEC to promulgate detailed regulations regarding coordinated communications, but specifically provided that "[t]he regulations shall *not require agreement or formal collaboration* to establish coordination." 116 Stat. 81, 95 (emphasis added).

24.     Under FEC regulations promulgated under this directive, a "coordinated communication" is a third-party expenditure that meets at least one "content standard" and one "conduct" standard. *See* 11 C.F.R. §§ 109.21(a)(1)-(3). "Agreement or formal collaboration . . . is not required for a communication to be a coordinated communication." *Id.* § 109.21(e).

25.     A payment for a communication made for the purpose of influencing a federal election that either meets the definition of "coordinated communication" under 11 C.F.R. § 109.21, or is an "expenditure" that is "made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee" or an agent thereof, but does not meet the definition of "coordinated communication," must be reported as an expenditure by the candidate whom it was intended to benefit, and is deemed, expect in specific circumstances, as an in-kind contribution to that candidate. 11 C.F.R. §§ 109.20, 109.21(b)(1)-(2).

26.     Any political committee, including a candidate committee, that receives a contribution (including the value of an in-kind contribution) exceeding $200 must report that receipt. 11 C.F.R. §§ 104.3, 104.8, 104.13. Similarly, political committees, including candidate committees, must report expenditures (including expenditures by others that are deemed to be made by the campaign because they are coordinated) exceeding $200. 11 C.F.R. §§ 104.3, 104.9.

27.     No person may knowingly solicit, accept, or receive a contribution from a foreign national. 52 U.S.C. § 30121(a)(2); 11 C.F.R. § 110.20(g).

## Administrative and Judicial Process

28.     Any person who believes there has been a violation of FECA may file a sworn complaint before the FEC. 52 U.S.C. § 30109(a)(1); 11 C.F.R. § 111.4.

29.     The complaint is first reviewed by the staff of the FEC's Office of General Counsel ("OGC").

30.     Based on the complaint, the response from the person or entity alleged to have violated FECA, facts developed by OGC, and OGC's recommendation, the FEC votes whether there is "reason to believe" a violation of FECA has occurred. 52 U.S.C. § 30109(a)(2). A "reason to believe" exists where a complaint "credibly alleges" a violation of FECA "may have occurred." FEC, *Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process*, 72 Fed. Reg. 12,545 (Mar. 16, 2007).

31.     If the FEC finds reason to believe that a violation has occurred, it conducts an investigation. 52 U.S.C. § 30109(a)(2); 11 C.F.R. § 111.10. As part of this investigation, it may submit written questions under order; issue subpoenas and subpoenas duces tecum; take depositions; and conduct field investigations or audits. 52 U.S.C. §§ 30107(a)(1)-(4), 30109(a)(2); 11 C.F.R. §§ 111.10-12.

32.     While most administrative complaints do not require assistance from other government agencies, FECA directs that "[i]n carrying out its responsibilities under this Act, the Commission shall, to the fullest extent practicable, avail itself of the assistance, including personnel and facilities of other agencies and departments of the United States," and authorizes all other such agencies and departments to "make available to the Commission such personnel, facilities, and other assistance" upon the FEC's request. 52 U.S.C. § 30106(f)(3).

33.     Under FECA, "any party aggrieved by an order of the Commission dismissing a complaint filed by such party . . . may file a petition" in this Court, and "the court may declare that the dismissal of the complaint. . . is contrary to

law, and may direct the Commission to conform with such declaration within 30 days, failing which the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint." 52 U.S.C. §§ 30109(a)(8)(A), (C).

## FACTUAL BACKGROUND

34.    On December 16, 2016, Plaintiffs filed a sworn administrative complaint with the FEC against the Government of the Russian Federation ("Russian Federation") and Donald J. Trump for President, Inc. ("Trump Campaign"), alleging and requesting an investigation into violations of multiple provisions of FECA during the 2016 election.

35.    Plaintiffs filed two amendments to the complaint, on May 3, 2017 and June 2, 2017, to provide new information.[1]

36.    The administrative complaint, as amended, recited detailed allegations regarding Russian political spending prohibited under FECA, and coordination between the Trump Campaign and the Russian Federation.

37.    Some of the allegations in the administrative complaint have been examined in separate investigations by other entities. However, critical questions raised by the administrative complaint have not been answered by other investigations, and remain unanswered. Due to the FEC's failure to proceed with

---

[1] The May 3, 2017 amendment completely revised and restated the original complaint; the June 2, 2017 amendment provided supplemental factual information and additional counts. For brevity, this complaint uses the term "the administrative complaint" to refer to the December 16, 2016 administrative complaint as amended by the May 3, 2017 and June 2, 2017 amendments.

an investigation on their complaint, Plaintiffs lack basic information regarding political spending in the 2016 election that is and was required to be (but has not been) disclosed under FECA, and which, to this day, is unknown to Plaintiffs or the American public.

### The Russian Influence Campaign's Conduct Prohibited by FECA

38.    As set forth in detail in the administrative complaint, the Russian Federation's efforts to influence the U.S. election involved conduct prohibited by FECA including, *inter alia*, expenditures of funds on activities intended to help candidate Donald Trump in his presidential campaign against Hillary Clinton.

39.    In 2016, key members of the Democratic National Committee and Clinton's campaign were victimized by a "phishing" attack. The attack involved communications transmitted directly to the targets in the United States. The information obtained through the phishing attack permitted hackers to gain access to thousands of internal Democratic Party and campaign emails stored on U.S. servers, including those of Clinton's campaign chairman. Hackers then transmitted the stolen e-mails to WikiLeaks, a web site that released this information beginning in the summer of 2016, just before the Democratic National Convention. The release of these email messages is widely agreed to have had the purpose of harming Clinton's electoral chances and of benefitting her competitor Trump.

40.    As the U.S. government concluded, the phishing attacks, subsequent hacking of e-mails, and distribution of stolen e-mails to WikiLeaks were performed by individuals employed or paid by the Russian Federation.

41.     With the apparent purpose of influencing the 2016 election, the Russian Federation sponsored cyber intrusions directly into over 20 U.S. state and local election systems, and successfully penetrated at least four.

42.     In addition, the Russian Federation paid individuals to communicate political messages via social media (such as Facebook) and other means to persons in the United States, for the purpose of influencing the election.

43.     A Russian Federation-paid team at a St. Petersburg, Russia-based entity called the Internet Research Agency posted substantial amounts of pro-Trump, anti-Clinton material on third-party web sites and communications media, such as Twitter. Some of these Russian Federation-paid actors used false or deceptive profiles suggesting that they were American citizens.

44.     The Russian Federation paid for political advertisements on web sites, such as Facebook, regarding the 2016 election.

45.     Many of these posts use words that in context could have had no other reasonable meaning than to urge the election of Donald Trump or the defeat of Hillary Clinton, and/or could only be interpreted by a reasonable person as containing advocacy of the election of Donald Trump or defeat of Hillary Clinton.

46.     The Russian Federation and the Trump Campaign concealed their wrongdoing through deception separate from the FECA violations themselves. Notably, through at least 2019, agents of the Trump Campaign (including Trump himself) issued false or misleading public statements, and obstructed official investigations into this wrongdoing. Examples of this deception include:

a.  Trump attempted to prevent Attorney General Jeff Sessions from recusing himself from an investigation into Russian activities in the 2016 election and potential Trump Campaign coordination.

b.  Trump fired the Director of the Federal Bureau of Investigation in an attempt to protect himself from the investigation.

c.  Trump attempted to fire Special Counsel Robert Mueller, who was charged with investigating Russian activities in the 2016 election and potential Trump Campaign coordination.

d.  Trump attempted to force Sessions to curtail the Mueller's investigation, to prevent further investigative scrutiny of Trump's and his campaign's conduct.

e.  Trump ordered White House Counsel Don McGahn to falsely deny that Trump had ordered him to fire Mueller.

f.  Trump attempted to have Sessions take control of Mueller's investigation, with an intended purpose that Sessions would supervise it in a way that would restrict its scope. When Sessions refused or failed to curtail the investigation, Trump forced him out and replaced him ultimately with William Barr.  Barr had been highly critical of the Mueller investigation publicly and had sought to influence the investigation (and curtail it) in his communications to the Department of Justice even while Sessions was still in office. Soon after taking office, Barr ensured that the investigation was

wound down and then made a series of public statements designed to mislead the public about its findings before releasing Mueller's actual report.

g.  Trump made statements directed to influence his former campaign manager Paul Manafort to influence Manafort's thinking on cooperation, with the intent of encouraging Manafort not to cooperate with the government, and made other public statements to influence Manafort's criminal trial jury.

### Coordination Between the Trump Campaign and the Russian Federation

47.  As set forth in detail in the administrative complaint, the Russian Federation evinced a clear preference for Trump, and its agents held numerous personal connections to the Trump Campaign. By December 2016, the existing record of public communications between the Trump Campaign and Russian Federation actors provided a *prima facie* case warranting a complete FEC investigation into whether the Russian Federation coordinated its expenditures with the Trump Campaign in a manner violating FECA.

48.  On June 27, 2016, in reference to Clinton's email messages, Donald Trump stated at a news conference: "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing. I think you will probably be rewarded mightily by our press."

14

49.    As set forth in detail in the administrative complaint, close associates of the Trump Campaign—most notably, Roger Stone—appeared to have advance knowledge of WikiLeaks publication of stolen e-mails.

50.    As set forth in detail in the administrative complaint, multiple high-level members of (and surrogates for) the Trump Campaign had direct and unusual communications with senior Russian Federation officials.

### ADMINISTRATIVE PROCEEDINGS

51.    Plaintiffs filed the administrative complaint with the FEC on December 16, 2016.

52.    On or about December 22, 2016, the FEC sent each Plaintiff a letter acknowledging receipt of the administrative complaint, designating it Matter Under Review ("MUR") No. 7207.

53.    On May 3, 2017 and on June 2, 2017, Plaintiffs filed amendments to the complaint providing additional information.

54.    As amended, the administrative complaint alleged six separate counts of violations of FECA:

a. Count I: The Russian Federation, a "foreign national" under 52 U.S.C. § 30121(b)(1), paid money to computer hackers to gain access to Democratic National Committee emails and to transmit those emails to WikiLeaks for the purpose of public distribution, for the purpose of influencing the outcome of the 2016 presidential election, in violation of 52 U.S.C. § 30121(a)(1)(C) and 11 C.F.R. § 110.20(f).

b. Count II: The Russian Federation paid money to individuals operating on social media to post material on others' web sites to promote Trump's candidacy and/or oppose Clinton's candidacy, in violation of 52 U.S.C. § 30121(a)(1)(C) and 11 C.F.R. § 110.20(f).

c. Count III: The Russian Federation failed to file any FEC disclosure reports regarding its independent expenditures, in violation of 11 C.F.R. §§ 109.10(b) and (c).

d. Count IV: The Russian Federation's release of hacked emails through a third-party conduit, and its paid social media posts, constituted either "coordinated communications" under 11 C.F.R. § 109.21, or expenditures otherwise coordinated under 11 C.F.R. § 109.20(b), with the Trump Campaign. Such coordinated spending would violate 52 U.S.C. § 30121(a)(1)(A) and 11 C.F.R. §§ 110.20(b) and 109.22 on the part of the Russian Federation, and 52 U.S.C. § 30121(a)(2) and 11 C.F.R. § 110.120(g) on the part of the Trump Campaign. Further, Count IV alleged, the Trump Campaign failed to report this spending as in-kind contributions, in violation of 11 C.F.R. §§ 104.3(a)-(b) and 109.21(b)(3).

e. Count V: The Russian Federation paid money to buy advertisements on Facebook for the purpose of influencing the election, in violation of 52 U.S.C § 30121(a)(1)(C) and 11 C.F.R. § 110.20(f).

    f.   Count VI: The Russian Federation failed to file disclosure reports for monies spent on political advertisements on Facebook that may constitute independent expenditures, in violation of 11 C.F.R. §§ 109.10(b) and (c).

55.    The May 2017 amendment to the administrative complaint also specifically urged that "in light of the potential national security implications of this case and FECA's requirement (52 U.S.C. § 30106(f)(3)) that '[i]n carrying out its responsibilities under this Act, the Commission shall, to the fullest extent practicable, avail itself of the assistance, including personnel and facilities of other agencies and departments of the United States,' the FEC should avail itself of the assistance of such other agencies and departments of the United States as necessary to conduct a full investigation."

### The Office of General Counsel's Findings and Recommendations

56.    On February 23, 2021—over four years after Plaintiffs filed their administrative complaint—the FEC's Office of General Counsel finalized its First General Counsel's Report ("Report").[2]

57.    Portions of the Report have been redacted.[3]

58.    The Report consolidated Plaintiffs' administrative complaint with several other later-filed complaints by unrelated parties.

---

[2] The Report is available at https://www.fec.gov/files/legal/murs/7207/7207_17.pdf.

[3] E,g., Report at 47 lines 1-9, 48 line 13 – 49 line 2.

### *The Report's Findings and Recommendations Regarding the Russian Federation*

59.   The Report described in detail how the Russian Federation perpetrated an "influence campaign," also known as "active measures," by (1) by conducting a social media campaign through the Internet Research Agency ("IRA"), a Russian LLC; and (2) a hack-and-release operation through a Russian military agency, the Main Intelligence Directorate of the General Staff of the Russian Army ("GRU").[4]

60.   The Report described the Russian social media influence campaign and attempted to estimate the IRA's total budget.[5] However, the Report stated, "[c]urrently available information does not indicate precisely how much the IRA spent on operations to interfere with the 2016 U.S. election."[6]

61.   The Report described the Russian hack-and-release operation conducted by the GRU, and how the GRU delivered hacked documents to WikiLeaks for public dissemination.[7] The Report stated that "there is no public information regarding specific amounts" spent by the GRU, but OGC assumed that the GRU had spent money on salaries and computer infrastructure as part of its hack-and-release operation.[8]

62.   The Report concluded that the Russian Federation (and the IRA) engaged in several distinct categories of illegal foreign national expenditures under FECA: paid advertising in the form of express advocacy communications;

---

[4] Report at 1-2.
[5] Report at 9-17.
[6] Report at 9.
[7] Report at 17-22.
[8] Report at 53-54.

expenditures in unknown amounts for various costs in connection with IRA-organized candidate rallies held in U.S. cities; payments made by the GRU in connection with the hack-and-release operation; salaries paid to IRA staff members to write and post "organic" express advocacy communications on social media; and general administrative costs relating to its 2016 election influence campaign, including to pay staff to post organic, non-express advocacy content necessary to develop the fake personas that attracted audiences to subsequently receive "payload" content directed at the election, and costs for computer infrastructure necessary to orchestrate the social media campaign.[9]

63.     Consequently, the Report recommended that the FEC find reason to believe that the Russian Federation violated 52 U.S.C. § 30121(a)(1)(C) and 11 C.F.R. § 110.20(f) by making prohibited foreign national expenditures and independent expenditures with respect to each of the five categories listed above, and that the Russian Federation violated 52 U.S.C. § 30104(c) and 11 C.F.R. § 109.10(b) by failing to report independent expenditures to the FEC.[10]

64.     The Report recommended that after finding reason to believe that the Russian Federation had violated FECA, the FEC take no further action.

### The Report's Findings and Recommendations Regarding the Trump Campaign

65.     The Report analyzed three interactions between the Trump Campaign and the Russian Federation, two of which are relevant here: (1) Trump's "Russia, if

---

[9] Report at 55-61.
[10] Report at 61.

you're listening" statement; and (2) contacts with WikiLeaks regarding the release of documents hacked by the Russians.[11]

66.    The Report concluded that Trump's statement during a campaign press conference ("Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing. I think you will probably be rewarded mightily by our press") constituted both a prohibited solicitation of a foreign national contribution and a request or suggestion within the meaning of the "coordination" regulation, 11 C.F.R. § 109.20(a).[12]

67.    The Report concluded, based on then-available evidence, that:

a.    Trump made an express, direct oral communication addressed to the Russian Federation, asking, requesting, or recommending that the foreign country provide something of value within the meaning of "contribution" under FECA;

b.    The Russian Federation made a contribution to the Trump Campaign by acting immediately in response to Trump's solicitation;

c.    The Russian Federation's expenditures were coordinated with the Trump Campaign, because they were made at Trump's request or suggestion, in response to Trump's press conference statement;

---

[11] Report at 23-39.
[12] Report at 64.

d.   Because they were coordinated, the Russian Federation's
      expenditures for the post-statement hacking operation constitute
      prohibited contributions to Trump and the Trump Campaign; and

e.   Because the Russian Federation made an expenditure by hacking
      his opponent at Trump's request or suggestion, Trump and the
      Trump Campaign therefore unlawfully accepted or received a
      prohibited in-kind contribution from a foreign government.[13]

68.   The Report distinguished a previous criminal investigation by Special
Counsel Robert Mueller, who had declined to prosecute the Trump Campaign for
this misconduct, because "[t]he Special Counsel's publicly known decisions to not
criminally prosecute were based on considerations that are materially distinct from
the Commission's consideration of these matters in an administrative and civil
context," including *mens rea*, the lower threshold for an administrative "reason to
believe" finding, and the fact that criminal prosecutions (but not civil enforcement)
under FECA require a minimum monetary threshold.[14]

69.   The Report additionally concluded that Roger Stone, acting as an
agent of the Trump Campaign, solicited hacked documents about Clinton from
WikiLeaks, an apparent foreign national organization. Specifically, Stone's
requests through intermediaries for specific emails from WikiLeaks represent
solicitations of material provided at no cost that would relieve the Trump

---

[13] Report at 64-68.
[14] Report at 70-72.

Campaign of the expense of obtaining such valuable information themselves, and that were not otherwise publicly available for the campaign's use.[15] The Report specifically found that Stone did this on behalf of the Trump Campaign because Trump and the most senior officers of the Trump Campaign appear to have granted Stone actual authority to solicit WikiLeaks by instructing Stone to contact WikiLeaks regarding future releases of hacked documents.[16]

70.    The Report distinguished the previous criminal investigation by Special Counsel Mueller, who had declined to prosecute the Trump Campaign for this misconduct, because the Special Counsel focused on WikiLeaks's *release* of stolen materials, not on Stone's *solicitation* of contributions from WikiLeaks.[17]

71.    In relevant part, the Report recommended that the FEC find reason to believe that the Trump Campaign violated 52 U.S.C. § 30121(a)(2) and 11 C.F.R. § 110.20(g) by knowingly soliciting, accepting or receiving an in-kind contribution from the Russian Federation in connection with Trump's press conference statement; and find reason to believe that the Trump Campaign violated 52 U.S.C. § 30121(a)(2) and 11 C.F.R. § 110.20(g) by knowingly soliciting a prohibited in-kind contribution from WikiLeaks.[18]

72.    Although the Office of General Counsel recommended finding that the Russian Federation *made* a prohibited in-kind contribution to the Trump

---

[15] Report at 72-80.
[16] Report at 78s-79.
[17] Report at 79-80.
[18] Report at 94, ¶¶ (3), (5).

Campaign by expending resources to hack Clinton-related servers in response to Trump's press conference statement, and that the Trump Campaign knowingly solicited, *accepted, or received* this exact prohibited in-kind contribution, the Report omitted any mention of whether to recommend finding reason to believe that the Trump Campaign had *failed to disclose* receipt of this in-kind contribution.

## The Commission's Action and Inaction

73.  On April 22, 2021, the FEC failed by a vote of 3-3 to find reason to believe that either the Russian Federation or the Trump Campaign had violated FECA. Commissioners Broussard, Walther, and Weintraub voted to find reason to believe that *both* had violated FECA. Commissioners Cooksey, Dickerson, and Trainor dissented.

74.  The FEC voted 4-2 to dismiss claims against the Russian Federation on the basis of prosecutorial discretion. However, a separate motion to dismiss the Trump Campaign on that basis failed by a vote of 3-3. Commissioners Cooksey, Dickerson, and Trainor voted to dismiss the Trump Campaign. Commissioners Broussard, Walther, and Weintraub dissented.

75.  On April 22, 2021, the FEC voted 6-0 to close the file as to the Russian Federation and the Trump Campaign (the only respondents identified in Plaintiffs' administrative complaint), but left the file open as to a congressional candidate not identified in Plaintiffs' administrative complaint.

76.  By letter dated August 18, 2021, the FEC informed Plaintiffs of its April 22, 2021 decision, and that the FEC had closed its file on August 10, 2021.

The letter further stated, "Documents related to the case will be placed on the public record within 30 days."

### The FEC's Unexplained Six-Month Further Delay

77.   Thirty days after August 18, 2021 was September 17, 2021.

78.   As of September 21, 2021, documents related to the case had not been placed on the public record.

79.   On September 21, 2021, counsel for Plaintiffs emailed counsel for the FEC, and inquired about the status of the public record. Counsel for the FEC responded, "We are currently in the process of preparing the public file and it will be released shortly. . . . Unfortunately, at this time, I don't have a precise date but we are working diligently to make the file available."

80.   On September 23, 2021, counsel for Plaintiffs emailed a letter to counsel for the FEC, advising that Plaintiffs would consider suing the FEC to compel the required publicization.

81.   On October 1, 2021, the FEC sent to Plaintiffs a letter stating in relevant part, "This letter is to inform you that, on September 28, 2021, the Commission voted to reopen the matter for further consideration."

82.   On January 19, 2022, the FEC sent to Plaintiffs a letter stating in relevant part, "On January 13, 2022, the Commission closed the file in this matter without making any additional findings."

83.     On February 18, 2022—six months after the FEC's August 18, 2021 letter, and ten months after its April 22, 2021 vote—the FEC publicized its record in the case via its web site.

84.     The record reveals only one action during the entire period between September 28, 2021, when the FEC reopened the matter for further consideration, and January 13, 2022, when the FEC voted 6-0 to close the file. However, that other action appears to have been redacted in its entirety.[19]

## The Commissioners' Explanations for their Votes

85.     Two of the three commissioners who had voted to find reason to believe that the Russian Federation and the Trump Campaign violated FECA issued a "Statement of Reasons" explaining their vote.[20] They explained how, with respect to the Russian Federation, they voted in accordance with the Office of General Counsel's recommendation to find reason to believe, but also to then take no further action because, in their view, "there was no realistic prospect that the Russian Federation or the IRA would cooperate and voluntarily enter into conciliation with the Commission[, t]he likelihood of success in obtaining a collectible judgment through litigation was low[. . . , and] other parts of the government were better situated to address these serious attacks on our national sovereignty and were taking steps to do so."[21]

---

[19] *Certification for MURs 7207, 7268, 7274, and 7623, Jan. 13, 2022* (executed Jan. 14, 2022), at 1 ¶ 1 (redacted), https://www.fec.gov/files/legal/murs/7207/7207_41.pdf.
[20] *Statement of Reasons of Comm'rs Shana M. Broussard & Ellen L. Weintraub*, https://www.fec.gov/files/legal/murs/7207/7207_47.pdf.
[21] *Statement of Reasons of Comm'rs Shana M. Broussard & Ellen L. Weintraub* at 5.

86.     However, they explained, "No similar factors militated against pursuing the non-State actor respondents." Thus, they supported the Office of General Counsel's recommendation to proceed to the next stage of the process with the Trump Campaign.[22]

87.     The three "dissenting" commissioners, who had voted *against* finding reason to believe that the Russian Federation and the Trump Campaign violated FECA (and *for* dismissing them based on prosecutorial discretion) issued their own Statement of Reasons, dated November 22, 2021 (seven months after their vote).[23] In it, these three commissioners explained, "We voted to dismiss these Respondents as an exercise of prosecutorial discretion for two principal reasons."[24]

88.     First, they stated, "the Commission's decision to await the completion of other ongoing investigations into these same events—including by the Department of Justice's Special Counsel Robert Mueller—undermined the Commission's ability to resolve these matters within the statute of limitations." In their view, "there was no reasonable chance for the Commission to bring an investigation and enforcement action to fruition in the time remaining" within the five-year statute of limitations for civil monetary penalties, 28 U.S.C. § 2462.[25]

---

[22] *Statement of Reasons of Comm'rs Shana M. Broussard & Ellen L. Weintraub* at 5.
[23] *Statement of Reasons of Vice Chair Allen Dickerson & Comm'rs Sean J. Cooksey & James E. "Trey" Trainor, III*, https://www.fec.gov/files/legal/murs/7207/7207_48.pdf.
[24] *Id.* at 2.
[25] *Id.* at 2.

89.     The dissenting commissioners did not mention the availability of non-monetary relief, such as "a permanent or temporary injunction, restraining order, or any other appropriate order" under 52 U.S.C. § 30109(a)(6).

90.     Second, they stated, "we believe that the Commission's interests have already been vindicated by the investigations conducted by other parts of the federal government."[26]

91.     Although the dissenting commissioners' Statement of Reasons explained why they voted *for* the motions to dismiss the Russian Federation and Trump Campaign as a matter of prosecutorial discretion, it did *not* address why they voted *against* finding reason to believe that either the Russian Federation or the Trump Campaign had violated FECA in the first place.

92.     Vice Chair Allen Dickerson provided a Supplemental Statement of Reasons in his own name only.[27] He stated, "I am persuaded that there is reason to believe the Russian Federation violated the Act."[28] He explained that, in his view, the FEC should "pursue such alleged violations as were supported by the record and let the courts judge Russia's claims of immunity."[29]

---

[26] *Id.* at 2.
[27] *Supp. Statement of Reasons of Vice Chair Allen Dickerson*, https://eqs.fec.gov/eqsdocsMUR/7207_49.pdf.
[28] *Id.* at 2.
[29] *Id.* at 3.

93.     However, for reasons partly redacted from the record, he stated that he would not vote to take administrative action against the Russian Federation without first informing the State Department and (unspecified) "others."[30]

94.     Vice Chair Dickerson's Supplemental Statement of Reasons did not address the question of why he voted against finding reason to believe that the Trump Campaign had violated FECA. It said, "This Statement addresses only the subset of these allegations concerning action by foreign entities."[31]

## Injury to Plaintiffs

95.     Due to the Russian Federation's and Trump Campaign's failure to disclose spending and prohibited in-kind contributions, and the FEC's closure of the file on the administrative complaint without further action, Plaintiffs have been deprived of information regarding campaign financing.

96.     If the FEC had voted to find reason to believe, it could have sought to conciliate with the respondents and to further investigate Plaintiffs' administrative complaint. Through these processes, the FEC could have sought not only monetary fines, but also non-monetary relief, including but not limited to requiring the Trump Campaign to disclose the monetary value of the in-kind contributions that it received from the Russian Federation.

97.     Plaintiffs' work on campaign finance-related issues—including public education, litigation, administrative advocacy and enforcement, and legislative

---

[30] *Id.* at 10.
[31] *Id.* at 2 n.9.

reform efforts—depends on accurate and complete campaign finance reporting as required by FECA. This work is obstructed where, as here, campaign finance information subject to mandatory disclosure under FECA is not available. Plaintiffs have a cognizable interest in the underlying information that an entity making independent expenditures, or accepting or receiving in-kind contributions, has not accurately or fully disclosed to the FEC. Without this information, Plaintiffs' campaign finance advocacy, public education work, and legislative reform efforts are inhibited. The withholding of information to which Plaintiffs are legally entitled also forces Plaintiffs to divert resources from other projects furthering their mission towards efforts to obtain the information.

98.    Plaintiffs are also involved in monitoring major social media and other technology companies (including Facebook) and their practices as they affect our democracy and elections. Information concerning foreign, coordinated, or other unlawful payments made to technology companies to influence the 2016 election, as alleged in the administrative complaint, would inform Plaintiffs' efforts to educate their members and the public regarding these companies' business practices, and to propose and advocate for legal reforms to such practices.

99.    The information that Plaintiffs lack includes information that the Russian Federation and/or the Trump Campaign were obliged to report to the FEC, and the FEC was obliged to make public, includes but is not limited to:

    a.  With respect to the Russian Federation's independent expenditures, including those in connection with its influence campaign, that

29

aggregated over $250 with respect to a given election in a calendar year, and in accordance with 11 C.F.R. § 109.10:

    i.  The reporting person's name, mailing address, occupation, and the name of his or her employer, if any;

    ii.  The identification (name and mailing address) of the person to whom the expenditure was made;

    iii.  The amount, date, and purpose of each expenditure;

    iv.  A statement that indicates whether such expenditure was in support of, or in opposition to a candidate, together with the candidate's name and office sought; if the expenditure meets the criteria set forth in 11 C.F.R. § 104.3(b)(3)(vii)(C), the states in which the communication was distributed;

    v.  Whether such expenditure was made in cooperation, consultation, or concert with, or at the request or suggestion of a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents; and

    vi.  The identification of each person who made a contribution in excess of $200 to the person filing such report, which contribution was made for the purpose of furthering the reported independent expenditure.

    vii.  The date of public distribution or dissemination, in accordance with Schedule 5-E of FEC Form 5.

    b.  With respect to those expenditures by the Russian Federation (including the expenditure of resources to hack Clinton-related servers in response to Trump's press conference statement) that were *coordinated* with the Trump Campaign under 11 C.F.R. § 109.20(b), or that were *solicited, accepted, or received* by the Trump Campaign: each person to whom an expenditure was made in an aggregate amount or value in excess of $200, together with the date, amount and purpose of each expenditure, in accordance with 11 C.F.R. §§ 104.3 and 104.13.

100.  To this day, Plaintiffs do not have this information.

101.  Plaintiffs' need for this information is ongoing, despite the passage of time. If Plaintiffs had access to this information, they would use it in some or all the following ways:

    a.  Publicizing the disclosed information to the general public via Plaintiffs' web sites and on social media.

    b.  Analyzing trends and patterns in the spending, including via in-kind contributions, and publicizing their analyses through research reports and in major news media.

    c.  Using the information and analyses to (1) determine whether to propose further federal or state legislation or oversight, and (2) brief legislators accordingly.

    d.  Analyzing the recipients of the payments to determine how to engage with them.

    e.  Other uses that can only be determined after reviewing the information.

102.  The Russian Federation and the Trump Campaign are still, as of today, obligated to disclose this information to the FEC, which in turn is required to make it public. The fact that the information required to be disclosed derives from unlawful spending does not absolve either party of their obligations.

103.  Due to both the Russian Federation and the Trump Campaign's underlying violations, and the FEC's failure to enforce the reporting, disclosure, and transparency requirements of FECA, Plaintiffs have not had access to still-unknown information regarding campaign financing.

104.  Plaintiffs have not had the opportunity to disseminate this information to their members or supporters, and have not had the opportunity to act on the information. Plaintiffs lacked this information during the 2018 and 2020 election cycles, when it could have been useful in informing their work on campaign finance-related issues, and continue to lack it as the 2022 election approaches.

105.  Both the Russian Federation and the Trump Campaign have been active in federal elections since the filing of the administrative complaint. In both 2018 and 2020, the Russian Federation attempted to influence U.S. federal elections. In 2020, Trump mounted an unsuccessful run for re-election.

106.   Because Plaintiffs lacked (and continue to lack) the information that was required to be disclosed in the 2016 election as alleged in the administrative complaint, they did not have the opportunity to disseminate this information to their members or supporters, or to otherwise act upon it, during the past nearly five years during which the information could have been useful in informing their work on campaign finance-related issues.

107.   The Russian Federation is already interfering in the 2022 election. According to President Biden, by July 2021 it was already apparent that the Russian Federation was again engaged in election interference.[32]

108.   Donald Trump is widely expected to run for president again in 2024.

109.   The Trump Campaign, now renamed Make America Great Again PAC but still operating under the same committee ID (C00580100), received nearly $12.8 million and spent nearly $16.9 million in calendar year 2021.

110.   The continued federal political activity of both the Russian Federation and the Trump Campaign, and the significant risk of future harm, highlights Plaintiffs' ongoing need for the information that they previously failed to disclose.

## CAUSE OF ACTION

## Count I—FECA (Dismissal of Complaint)

111.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

112.   The FEC dismissed Plaintiffs' administrative complaint.

---

[32] Steve Herman, "Biden Accuses Russia of Already Interfering in 2022 Election," VOA News, July 27, 2021, https://bit.ly/3HT5mWP.

113. The FEC's dismissal of Plaintiffs' administrative complaint was contrary to law under 52 U.S.C. § 30109(a)(8)(A).

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a) Declare that the FEC's dismissal of Plaintiffs' administrative complaint was contrary to law under 52 U.S.C. § 30109(a)(8)(C);

b) Order the FEC to conform with this declaration within 30 days, under 52 U.S.C. §§ 30109(a)(8)(A)-(C), failing which Plaintiffs may bring, in their own names, a civil action to remedy the violation involved in the original complaint, under § 30109(a)(8)(C);

c) Award legal fees and costs of suit incurred by Plaintiffs; and

d) Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

March 10, 2022

/s/ Ronald A. Fein
Ronald A. Fein (D.D.C. Bar No. MA0012)
Courtney Hostetler*
John C. Bonifaz*
Ben Clements*
Free Speech For People
1320 Centre St. #405
Newton, MA 02459
(617) 244-0234
rfein@freespeechforpeople.org

*Counsel for plaintiffs*

*Motion for *pro hac vice* admission forthcoming